*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0341p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ALETHEA EVANS,

*Defendant-Appellant.*

No. 07-2565

>

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-50210—Avern Cohn, District Judge.

Argued: June 12, 2009

Decided and Filed: September 22, 2009

Before: SUTTON and GRIFFIN, Circuit Judges; LIOI, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Todd Shanker, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellant. Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Todd Shanker, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellant. Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

_____

**OPINION**

_____

GRIFFIN, Circuit Judge. Defendant Alethea Evans appeals the district court's order affirming her conviction for threatening to assault a federal law enforcement officer in violation of 18 U.S.C. § 115(a)(1)(B). Evans claims that the Federal Protective Service ("FPS") officers who conducted an investigative stop of her vehicle violated her

_____

[*] The Honorable Sara Lioi, United States District Judge for the Northern District of Ohio, sitting by designation.

Fourth Amendment rights by exceeding their jurisdictional authority under 40 U.S.C. § 1315. We disagree and affirm. In doing so, we hold that the FPS officers reasonably exercised their investigative and protective authority pursuant to § 1315 when they left federal property to surveil Evans's vehicle. We further hold that Evans's conduct, specifically, her tailgating of the FPS officers' marked police vehicle and her visible hand gestures, which simulated the firing of a gun, provided the FPS officers with probable cause to arrest her, regardless of her presence on non-federal property.

## I.

The evidence adduced at trial established the following: On February 13, 2006, Veronica Cartwright and Qualette Pasha were in the Detroit Social Security Administration ("SSA") building. Dennis Cleveland, a security guard, observed Pasha using her cell phone in the SSA lobby. Cleveland asked her to end her call because cellular phone use is prohibited in the SSA building. He "waited a few minutes" and observed Pasha still using her cell phone. He approached her a second time and asked her to hang up. However, instead of ending her call, she activated the cell's speaker phone and continued to talk, which "every[one] heard." Cleveland left the lobby and contacted Federal Protective Services for assistance. When Cleveland returned to the lobby, Pasha "had got into it with somebody else . . . ."

FPS Officers Kerwin Smith and Warren King received a radio dispatch reporting a "disturbance" at the SSA office. When they arrived, Cleveland pointed out Pasha and Cartwright to Officer Smith. Officers Smith and King escorted the women outside and asked them to leave the property. Officer Smith characterized Pasha's and Cartwright's behavior as "very disorderly" and testified that when the women were outside the building, "[t]hey continued to talk on the telephone, telling people to come up to the Social Security office. They were . . . still being loud and belligerent, and they were [] cussing . . . ."

Cleveland testified that when he stepped outside to check on the situation, he observed one of the women "with the cell phone [] turned [on to] speaker . . . playing music – and [she] was just dancing in front of the two federal police officers." Officer

Smith did not take any official action at that time, however, because "they were young girls" and he "figured that they were just trying to show off[,] " deciding that "it wasn't worth sending them through the problems of coming to court [and] paying [] serious fines." Officer Smith knew that "someone was coming to [pick them up]," and he and King waited with the women "[t]o ensure that they did get off the property and that they didn't cause any more problems inside of the building."

A short time later, defendant Alethea Evans arrived at the scene in "an older model [] burgundy Lincoln" automobile to transport Pasha and Cartwright. As Evans pulled up to the SSA building, she caused another vehicle "to stop and pull over to avoid being hit." She made "a U-turn" and pulled her car into the SSA parking lot, "blocking the driveway of the [SSA] office." Instead of leaving the property, Evans exited the vehicle and walked into the SSA office while Pasha and Cartwright waited in her car.

According to Officer Smith's testimony, Evans was acting "belligerent" and making hostile comments regarding whoever instructed Pasha to stop using her cell phone. Neither Smith nor King spoke directly with Evans, but Smith testified that he overheard her make vociferous statements, such as "I'm going to find out who . . . told you you couldn't stand here," and "[l]et me see who it is that's telling you that you can't come into the Social Security office and talk on the phone." Officer Smith stated that her comments were disconcerting because he "took it as somewhat of a – a threat on the person or the security guard who was sitting inside the – the office, that maybe at a later date, that this person may come back to – to cause some kind of harm or disturbance[,]" and that he believed that "[s]he made some type of indication that, you know, she was going to return . . . to find out who this was that told . . . the other two girls [that they] could not use the telephone." Evans stayed inside the SSA office for "a minute to two minutes" and then returned to her car. Cleveland testified that while inside the SSA office, Evans requested "a printout of her social security number."

A few minutes later, Evans left the SSA building and drove away. Smith recorded Evans's license plate number "[f]or further investigation . . . in case there was something that should happen, again, to either the guard or to the property of the Social

Security Office." Officer King also provided Evans's license plate number to his dispatcher, testifying that it was standard procedure to "run" an individual's license plate number while investigating an incident.

Officers Smith and King decided to follow Evans's car "to keep an eye on [it] until [they] received some type of response from [] dispatch." After leaving SSA property, they watched her vehicle for one-half mile until they received a negative report from their dispatcher. At that point, they traveled past Evans's vehicle, "made a right [turn onto] Curtis [Street]," and basically considered the incident "over."

However, "[a]pproximately four to five blocks from the SSA office," Evans maneuvered her car behind the officers' FPS vehicle and began "tailgating" their marked police car. According to Officer Smith's and King's testimony, the women inside the car were reaching underneath their seats and making visible hand gestures in the direction of the FPS vehicle, their thumbs and index fingers raised, "as if they were pointing a gun." Smith testified "[t]o me, it looked like – as if they were indicating that they had a weapon." King offered similar testimony, stating that as he "looked out the back window . . . [and] noticed that both of them were sitting there showing a gun motion . . . as if they had guns . . . hey – to me, [] this is a threat . . . [t]hey were right on our bumper."

Officer Smith activated the patrol car's emergency lights and stopped Evans's vehicle. When Smith and King approached Evans, she made various obscene remarks and refused to lower her car window or produce her driver's license or registration.[1] She informed Smith and King that she would not comply with their instructions because they were not "real" police officers, despite their full-dress uniform, FPS vehicle (which displayed the word "police" in six different locations), and badges.

Officer King radioed the City of Detroit Police Department for assistance. Several Detroit police officers arrived at the scene and informed Evans that Smith and

---

[1]According to Officer Smith's testimony, Evans's stated "f--k you. You ain't nobody. You ain't sh-t. Get the f--k out of here[.]" In addition, Evans informed the officers that she was going to "call Kwame's office[.]" At the time of the incident, Kwame Kilpatrick was the Mayor of the City of Detroit.

King were federal law enforcement officers. At that point, Evans provided Officer Smith with her driver's license and vehicle registration. With this information in-hand, Officer Smith contacted dispatch, who ran Evans's information through the Law Enforcement Information Network ("LEIN"). The dispatcher reported to Officer Smith that there was an outstanding warrant for Evans's arrest issued by the City of Detroit.[2]

The FPS officers took Evans into custody. While Smith and King were transporting Evans to the McNamara Federal Building "for processing," they received an additional report from their dispatcher concerning an unserved personal protection order against an individual with the same name as defendant. According to Smith, at some point during the transfer, he "asked [Evans] [if] she kn[ew] that she had a . . . personal protection order issued against her." Officer Smith testified that when he asked Evans this question, he was attempting to ascertain whether she was the same person named in the order. Evans responded "Yeah, that's me. That's the same bitch-ass mother-f--ker who – who tried to lock me up the last time, and I was going – I was going to kill his ass just like I'm going to do to you and your mama" (hereinafter referred to as the "verbal threat"). According to Smith, Evans's response "indicated . . . that [the personal protection order] was [obtained by] a police officer who had [previously] arrested her." According to Smith's police report, he then asked Evans "[are you] threatening me," and Evans responded "'you'll see.'"[3] Shortly thereafter, Officers Smith and King arrived at the federal building, processed Evans, and turned her over to the Detroit police.

---

[2]It was later determined (one week before trial) that the outstanding warrant was a state misdemeanor warrant for assault and battery and malicious destruction of property under $200. Officer Smith testified that when he received a positive LEIN check, he was trained to ". . . arrest that person, and if it [is] our warrant, I would process them; if it [is] another agency's warrant, we would detain that person and take them into our custody until they came and took them and processed them themselves."

[3]The second half of their exchange was not developed at trial.

II.

As a result of the SSA incident, Evans was charged with two federal violations: "failure to comply with directions of a police officer," pursuant to 41 C.F.R. § 102-74.390, and threatening to assault a federal law enforcement officer, under 18 U.S.C. § 115(a)(1)(B).  She entered a plea of not guilty at her subsequent arraignment.

Evans filed several pretrial motions, arguing that Smith and King lacked jurisdiction to conduct an investigative stop of her vehicle on non-federal property.  The magistrate judge conducted a one-day bench trial on October 30, 2006, reserving her rulings on the pretrial motions until the close of evidence.  At the conclusion of the trial, the magistrate judge denied Evans's motions to dismiss the indictment and to suppress evidence, convicted her of threatening to assault a federal law enforcement officer in violation of 18 U.S.C. § 115(a)(1)(B), but acquitted her for failing to comply with the directions of a federal law enforcement officer under 41 C.F.R. § 102-74.390, noting that "the C.F.R." ticket "[was] limited to federal property."  Evans appealed the judgment to the district court.

The district court affirmed.  In so ruling, the district court ruled that the officers were conducting an investigation that began on federal property, which was "'necessary to protect the property and persons on the property.'"[4]  The district court further held that Evans's actions before her arrest, specifically, "'tailgating' the police car and making hand gestures that suggested pointing a gun at the officers, [was] sufficient to

---

[4]The district court noted in its opinion that it would "rely" on the evidentiary record developed by the magistrate judge because it was not required to conduct a new trial or evidentiary hearing, citing *United States v. Raddatz*, 447 U.S. 667, 673-76 (1980).  According to Federal Rule of Criminal Procedure 58(g)(2)(D), the district court judge is required to apply the same standard of review to the magistrate judge's decision as this court would apply to a decision that originated from a district court judge.  "The defendant is not entitled to a trial de novo by a district judge.  The scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge."  Fed. R. Crim. P. 58(g)(2)(D). Thus, the district court properly reviewed the magistrate judge's legal determinations de novo and her factual findings for clear error.  *See United States v. Ali*, 557 F.3d 715, 720 (6th Cir. 2009) ("we review de novo the district court's denial of [a] motion to dismiss the indictment"); *United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008) (when reviewing the district court's decision regarding a motion to suppress, we review its factual findings for clear error and its legal conclusions de novo).

sustain her conviction under § 115(a)(1)(B)."  *United States v. Evans*, No. 07-50210, 2007 WL 4456327 at *3 (E.D. Mich. Dec. 14, 2007) (unpublished).**5**

Evans timely appeals.

## III.

Evans asserts three arguments on appeal:  (1) the FPS officers were not acting within the scope of their jurisdictional authority under 40 U.S.C. § 1315 when they surveilled and seized Evans on non-federal property; (2) the FPS officers exceeded their jurisdictional authority under 40 U.S.C. § 1315 when they arrested Evans pursuant to a state misdemeanor warrant; and (3) the district court erred when it affirmed the magistrate judge's denial of Evans's motion to suppress her "verbal threat."

We address each argument in turn.

## A.

Section 1315, Chapter 40 of the Unites States Code enumerates the duties and powers of Federal Protective Service officers:

> (a) In general.  To the extent provided for by transfers made pursuant to the Homeland Security Act of 2002, the Secretary of Homeland Security (in this section referred to as the "Secretary") shall protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government (including any agency, instrumentality, or wholly owned or mixed-ownership corporation thereof) and the persons on the property.

---

[5]Evans challenged the legal sufficiency of the 18 U.S.C. § 115 violation insofar as § 115(a)(1)(B) requires the government to prove beyond a reasonable doubt that the defendant made the threat for the specific purpose of interfering with the performance of official duties or of retaliating for the performance of such duties.  *See United States v. Veach*,  455 F.3d 628, 633 (6th Cir. 2006).  As the district court noted in its opinion:

> On appeal, Evans does not dispute that she threatened a Federal law enforcement officer.  However, she says that the FPS officers exceeded the statutory authority conferred on them by 40 U.S.C. § 1315(b) when they conducted an investigative stop of her vehicle and arrested her on an outstanding state court warrant.  Evans goes on to argue that, as a consequence, the officers were not engaged in "official duties" under 18 U.S.C. § 115(a)(1) and that the indictment against her for violation of § 115(a)(1) should be dismissed.

(Footnote omitted.)  Evans does not challenge this ruling on appeal.

(b) Officers and agents.

(1) Designation. The Secretary may designate employees of the Department of Homeland Security, including employees transferred to the Department from the Office of the Federal Protective Service of the General Services Administration pursuant to the Homeland Security Act of 2002, as officers and agents for duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property.

(2) Powers. While engaged in the performance of official duties, an officer or agent designated under this subsection may –

(A) enforce Federal laws and regulations for the protection of persons and property;

(B) carry firearms;

(C) make arrests without a warrant for any offense against the United States committed in the presence of the officer or agent or for any felony cognizable under the laws of the United States if the officer or agent has reasonable grounds to believe that the person to be arrested has committed or is committing a felony;

(D) serve warrants and subpoenas issued under the authority of the United States;

(E) conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Federal Government or persons on the property; and

(F) carry out such other activities for the promotion of homeland security as the Secretary may prescribe.

40 U.S.C. § 1315.

Section 115(a)(1)(B), Chapter 18 of the Unites States Code provides, in pertinent part:

(a)(1) Whoever –

(B) threatens to assault, kidnap, or murder, a United States official, a United States judge, a Federal law enforcement officer, or an official whose killing would be a crime under such section,

with intent to impede, intimidate, or interfere with such official, judge, or law enforcement officer while engaged in the performance of official duties, or with intent to retaliate against such official, judge, or law enforcement officer on account of the performance of official duties, shall be punished . . .

18 U.S.C. § 115(a)(1)(B).

### B.

Whether a seizure is reasonable under the Fourth Amendment is a question of law that we review de novo. *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009). When reviewing the district court's decision regarding a motion to suppress, we review its factual findings for clear error and its legal conclusions de novo. *United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008). We are required to view the evidence in the light most likely to support the decision of the district court. *United States v. Alexander,* 540 F.3d 494, 500 (6th Cir. 2008).

Evans argues that the FPS officers' alleged lack of "jurisdiction" violated the Fourth Amendment's guarantee that government officials may not subject citizens to searches or seizures without proper authorization. More specifically, she argues that "[t]he concept of reasonableness embodied in the Fourth Amendment logically presupposes an exercise of lawful authority by a police officer[,]" *United States v. Foster*, 566 F. Supp. 1403, 1412 (D.C. D.C. 1983), and that when "a law enforcement official acts beyond his or her jurisdiction, the resulting deprivation of liberty is just as unreasonable as an arrest without probable cause." *Id.*

While we agree that our inquiry is governed by the Fourth Amendment, Evans's argument regarding the presumptive unreasonableness of a seizure without proper

jurisdiction is too broad. Indeed, "an officer can act incorrectly with regard to his jurisdiction just as he can act incorrectly with regard to any other factor involved in the exercise of his authority." *Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 527 (7th Cir. 2001). We need not decide this issue, however, because we conclude that Officers Smith and King reasonably exercised their investigative and protective authority pursuant to 40 U.S.C. § 1315 when they left federal property to surveil Evans's vehicle.

> In affirming the magistrate judge's rulings, the district court ruled:
>
> 40 U.S.C. § 1315(b)(1) charges FPS officers with "protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property." Subsection 1315(b)(2) provides that:
>
>> [w]hile engaged in the performance of official duties, an officer or agent designated under this subsection may . . . enforce Federal laws and regulations for the protection of persons and property . . . make arrests without a warrant for any offense against the United States committed in the presence of the officer or agent . . . [and] conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Federal Government or persons on the property.
>
> The statute thus expressly empowers FPS officers to conduct investigations and make arrests outside of federal property when "necessary to protect the property and persons on the property."
>
> Here, the record indicates Smith observed the initial disturbance at the SSA office and Evans' hostile comments when she arrived on the scene. He interpreted Evans' conduct "as somewhat of a–a threat on the person or the security guard who was sitting inside the–the office, that maybe at a later date, that this person may come back to–to cause some kind of harm or disturbance." Smith therefore determined to monitor Evans, Cartwright, and Pasha in an effort to avoid any further disruption at the SSA office. In short order, Evans purposefully began to harass the officers by "tailgating" their patrol car, making threatening gestures, and refusing to cooperate after the officers initiated an investigative stop.
>
> In monitoring what they reasonably believed to be an ongoing threat to the orderly functioning of the SSA office, the FPS officers were

operating within the protective and investigative roles prescribed by the statute.

We agree. Although the FPS officers did not speak directly with Evans, Officer Smith testified that he heard her make vociferous statements expressing her desire to locate the person who told Pasha that she couldn't use her cell phone. Officer Smith testified that her comments were disconcerting because he "took it as somewhat of a [] threat on the . . . security guard who was sitting inside the [] office, that maybe at a later date, that [she] may come back to . . . cause some kind of harm or disturbance."

Under 40 U.S.C. § 1315(b)(1), Officers Smith and King are authorized to protect persons on property owned or occupied by the Federal Government, "including . . . areas outside the property to the extent necessary to protect the property and persons on the property." Moreover, section 1315(b)(2)(E) empowers FPS officers to "conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Federal Government or persons on the property." 40 U.S.C. § 1315(b)(2)(E). Officer Smith testified that he decided to surveil Evans's vehicle "to keep an eye on [it] until [they] received some type of response from [] dispatch" because he suspected that she might return.

The FPS officers followed Evans for "maybe half a mile," until they received a negative report from dispatch. Once they received the report, they "traveled past the vehicle," and considered the incident "over." Their decision to abandon the investigation once they received the negative report supports the magistrate judge's and district court's rulings that the officers were reasonably exercising their investigative and protective authority under § 1315. In addition, and for the same reasons, we conclude that Officers Smith and King were performing "official duties" under § 1315(b)(1) and § 1315(b)(2)(e) when Evans began to tailgate the FPS officers' police vehicle.

C.

Next, Evans asserts that the FPS officers exceeded their jurisdictional authority under 40 U.S.C. § 1315 when they stopped her vehicle on non-federal property and arrested her pursuant to a state misdemeanor warrant.  Again, we disagree.

FPS officers have the authority, "[w]hile engaged in the performance of official duties" to "make arrests without a warrant for any offense against the United States committed in the presence of the officer or agent . . ." 40 U.S.C. § 1315(b)(2)(C).  According to both Smith's and King's testimony, the women in the vehicle reached underneath their seats and made handgun gestures in the direction of the police car, their thumbs and index fingers raised, "as if they were pointing a gun."  Smith testified that "[t]o me, it looked like – as if they were indicating that they had a weapon."  King offered similar testimony, stating that as he "looked out the back window . . . [and] noticed that both of them were sitting there showing a gun motion . . . . as if they had guns . . . hey – to me, [] this is a threat . . . . [t]hey were right on our bumper."

Thus, not only did FPS Officers Smith and King have authority to conduct an investigative stop of Evans's vehicle, they had probable cause to arrest her for threatening to assault a federal law enforcement officer in violation of 18 U.S.C. § 115(a)(1)(B).  "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).  Probable cause requires officers to "show more than mere suspicion" but "does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence to establish guilt beyond a reasonable doubt." *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998).

The magistrate judge applied this reasoning in her ruling:

It makes no difference whether or not [the threat] occurs on federal property. It's the threat against the federal law enforcement officer. The [] statute requires that:

> whoever with intent to impede, intimidate, or interfere with such official law enforcement officer while engaged in the performance of official duties or with intent to retaliate against such official law enforcement officer on account of the performance of official duties, shall be punished.
>
> There is no question based on this testimony here that the defendant did commit such an act. All of her efforts in driving up on the bumper of the marked police vehicle with uniformed police officers inside was directed to impede, intimidate, interfere, or retaliate on account of the performance of their official duties. There is no mistaking that they were federal police officers, and I think that had the circumstances been the way they were, she arguably could have been charged under state law with assault with a deadly weapon, using the vehicle as a weapon. She was not, and I believe that the Federal Protective Services officers tried to extend her every courtesy in this regard by issuing only the violation notices.
>
> The gesture of reaching under the seat by herself and the passenger and then coming up with gestures indicating guns is clearly a threat on the officers for the action that they had undertaken in asking her and her friends to leave the Social Security office.

Specifically, the "facts and circumstances within [Smith's and King's] knowledge . . . were sufficient to warrant a prudent" person to conclude that Evans was committing an offense against the United States. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Section 115(a)(1)(B) prohibits any person from threatening to assault a federal law enforcement officer with intent to interfere or retaliate against that officer "on account of the performance of [his] official duties." 18 U.S.C. § 115(a)(1)(B). As the district court and magistrate judge recognized, Evans's conduct, her tailgating of the FPS officers' marked police vehicle, and her visible hand gestures, which simulated the firing of a gun, provided the FPS officers with probable cause to arrest her, regardless of her presence on non-federal property.[6]

In addition, it is irrelevant that Officers Smith and King arrested Evans on the basis of the state misdemeanor warrant:

---

[6]In addition, Evans's motion to suppress her "verbal threat" against Officer Smith is arguably futile given this demonstrable conduct. Specifically, Evans's arguments on appeal presuppose that her verbal threat was the only evidence sufficient to obtain her conviction under 18 U.S.C. § 115(a)(1)(B).

> That is to say, [Smith's] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause. As we have repeatedly explained, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."

*Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). Thus, the FPS officers acted reasonably and within their authority when they stopped Evans's vehicle and subsequently arrested her.

D.

Finally, Evans argues that the district court erred in affirming the magistrate judge's denial of her motion to suppress the "verbal threat" against Officer Smith. As previously noted, even if the magistrate judge had suppressed this statement, Evans's non-verbal conduct provided the magistrate judge with sufficient evidence to convict her of violating 18 U.S.C. § 115(a)(1)(B). Nonetheless, we hold that Evans's response to Officer Smith's question, specifically, "[y]eah, that's me. That's the same bitch-ass mother-f--ker who – who tried to lock me up the last time, and I was going – I was going to kill his ass just like I'm going to do to you and your mama" was spontaneously volunteered and unresponsive to his question.

*Miranda* forbids the prosecution from using statements made by a defendant during a custodial interrogation unless the defendant had first been advised of her constitutional rights. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). Evans claims that Officer Smith was interrogating her when he asked her about the personal protection order. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes omitted). The parties agree that Evans was in custody when she made the statement.

According to Officer Smith's testimony, he asked Evans if she was "the person who had a personal protection order issued against her."  Thus, he was attempting to ascertain whether she was the same individual named in the protection order.  In addition, the substance of his question concerned a purely civil matter.  Evans's response was neither expected nor compelled by Officer Smith's question.  On the contrary, it was spontaneously volunteered in a deliberate attempt to threaten him – a new and distinct crime.  In this regard, no individual has a constitutional right to be warned of his rights before he commits a crime.  *United States v. Castro*, 723 F.2d 1527 (11th Cir. 1984).  Thus, the district court properly affirmed the magistrate judge's ruling denying the motion to suppress.

IV.

For these reasons, we affirm the judgment of the district court.