RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0278p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 14-4004

JEFF BOYD LEVENDERIS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:11-cr-00052—Jack Zouhary, District Judge.

Argued: October 8, 2015

Decided and Filed: November 12, 2015

Before: MERRITT, DAUGHTREY, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Amy R. Mohan, SHERRARD & ROE, PLC, Nashville, Tennessee, for Appellant. Aditya Bamzai, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Amy R. Mohan, Ryan T. Holt, SHERRARD & ROE, PLC, Nashville, Tennessee, for Appellant. Aditya Bamzai, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Matthew W. Shepherd, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

GRIFFIN, Circuit Judge. Fifteen years ago, defendant Jeff Levenderis produced ricin in his kitchen and stored it in his freezer. Levenderis intended to use the ricin for various purposes,

including an elaborate suicide plot in which he would light his house on fire and hang bottles of ricin in the doorway to prevent firefighters from entering his home. The federal government prosecuted Levenderis for possessing a biological toxin for use as a weapon in violation of 18 U.S.C. § 175(a). On appeal, Levenderis argues that, in light of the Supreme Court's recent decision in *Bond v. United States*, 134 S. Ct. 2077 (2014), the federal prohibition on biological weapons does not apply to his allegedly "purely local" conduct. We disagree and affirm.

I.

Sometime around 2000 when he was approximately 44 years old, Jeff Levenderis obtained a handful of castor beans. Using a "recipe" he found on the Internet, he ground the beans into a fine powder, which he further distilled in an acetone solution. The end result was a "high-grade" form of ricin: a deadly toxin capable of killing every cell it comes in contact with. Levenderis divided the finished product into three pill bottles, which he stored in a coffee can in his freezer. The coffee can remained in defendant's freezer until an FBI HAZMAT team removed it in January 2011.

The FBI discovered Levenderis' ricin activities through a series of unfortunate, health-related events in his life. In the fall of 2010, he fell ill, was hospitalized, and was later admitted to a long-term nursing facility. While Levenderis was away, an acquaintance, Robert Coffman, agreed to help him with the upkeep of his house. After roughly two months, Levenderis asked Coffman to check whether a coffee can was still in the freezer and, if so, not to disturb it. Coffman reported back that it was, and defendant eventually disclosed to him that the can contained ricin. After discussing various ways to dispose of it, the two decided to contact the fire department. On January 24, 2011, Coffman made inquiries with the local fire department. Within thirty minutes, Coffman received a phone call from the FBI.

The same day, the FBI visited Levenderis at his nursing home. Three agents arrived at the nursing home and saw defendant standing in the hallway near the door to his room. They identified themselves as FBI agents and asked if they could speak with him. All four proceeded into his room, where defendant laid down on his bed, and the agents sat in chairs in various parts of the room. When asked whether there was a dangerous substance in his freezer, defendant said that he had made ant poison using a recipe he found on the Internet. The agents asked whether

he ever told Coffman it was ricin; defendant said that if he did, he was only joking. After being advised that lying to the FBI is a federal offense, defendant still maintained that the substance was ant poison.

Agents interviewed defendant again on January 27, 2011. Before agents could ask defendant any questions, he reiterated that the substance was ant poison, not ricin. He then asked to make a few phone calls, which the agents allowed him to do. Following the phone call, defendant indicated that he wanted to have an attorney present. The agents ended the interview and left.

Later that afternoon, defendant visited the FBI field office with his attorney, Hank Meyer, and Coffman "to clear up a few things about [his] previous interviews." During the interview, defendant admitted that the substance "was actually a high-grade, weaponized form of ricin . . . ." Defendant stated that he thought about using the ricin as part of an elaborate suicide plan in which he would light his house on fire, hang bottles of ricin in each doorway, and put signs up indicating the bottles contained ricin in order to prevent firefighters from entering the home and putting out the fire. He also mentioned using it as a way to threaten his cousin, with whom he was feuding, from coming to his house. In addition, the FBI learned that defendant also intended to poison his step-father, with whom he had disputes over inheritance and financial matters, by putting ricin in a bowl of soup.

Meanwhile, an FBI HAZMAT team extracted the coffee can from the freezer and, after conducting various tests, determined that it contained 35.9 grams of ricin, enough to kill over 250 people.

A federal grand jury indicted defendant on four counts: (1) knowingly developing, producing, stockpiling, retaining, and possessing a biological toxin and delivery system (ricin) for use as a weapon, 18 U.S.C. § 175(a); (2) knowingly possessing a biological toxin and delivery system (ricin) that was not in its naturally occurring form and was of a type and quantity that, under the circumstances, was not reasonably justified by a peaceful purpose, 18 U.S.C. § 175(b); and (3) and (4) willfully and knowingly making a materially false, fictitious, and fraudulent statement to the FBI during the January 24 and 27, 2011, interviews that the substance found was ant poison, not ricin, 18 U.S.C. § 1001(a)(2).

Before trial, defendant filed a motion to suppress his statements to FBI agents. He argued that the interviews constituted custodial interrogations that were not preceded by *Miranda*[1] warnings. Following an evidentiary hearing at which two of the interviewing agents testified, the magistrate judge recommended the motion be denied because defendant was not "in custody" for purposes of *Miranda*. The district court adopted the recommendation over defendant's objections, ruling that, under the totality of the circumstances, a reasonable person would have felt free to terminate the interviews.

Defendant also filed a pre-trial motion to exclude unreliable expert testimony regarding the tests used to determine whether the substance recovered was ricin. Defendant argued that the three tests conducted by the government's experts—the ELISA test, the CFT assay, and the MALDI-TOF mass spectrometric analysis—were unreliable and, therefore, the expert testimony should be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The district court conducted a three-day *Daubert* hearing, during which defendant withdrew his challenge to the ELISA and CFT tests, conceding that his objection went to "[the] weight rather than admissibility and [was] not a *Daubert* matter." At the close of the *Daubert* hearing, the government decided to withdraw the MALDI-TOF test results and to conduct a fourth test—tandem mass spectrometry analysis—that defendant argued was more reliable. That test confirmed definitively that the substance was ricin.

The case proceeded to trial and the jury found defendant Levenderis guilty on all four counts. Before the verdict, however, defendant filed a motion for a judgment of acquittal based on the Supreme Court's decision in *Bond v. United States*, 134 S. Ct. 2077 (2014), which had been released two days earlier. The court denied the motion, but invited post-trial briefing on the applicability of *Bond*. Thereafter, the court ruled that *Bond* did not require it to vacate defendant's conviction under § 175(a) because, unlike in *Bond*, the substance defendant

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

possessed was inherently dangerous and had the potential to harm hundreds of people. Thus, it held that Levenderis was properly subject to federal prosecution on that count.**2**

The court subsequently sentenced defendant to concurrent terms of six years in prison for the biological weapons conviction and five years in prison for each false-statement conviction. Defendant timely appealed, raising three issues: (1) whether the Supreme Court's decision in *Bond* requires reversal of his biological weapons conviction; (2) whether the district court erred in denying his motion to suppress; and (3) whether defendant's trial counsel provided ineffective assistance by withdrawing his *Daubert* challenge to the government's scientific testing and expert witnesses. We address each in turn.

II.

A.

In his first claim on appeal, defendant challenges his conviction under 18 U.S.C. § 175(a) for possessing a biological toxin for use as a weapon, arguing that the federal statute does not apply to his allegedly "purely local" conduct. The district court treated this argument as a motion to dismiss the indictment under Federal Rule of Criminal Procedure 12(b)(3). Although the standard for reviewing such motions is "somewhat unclear," we "generally undertake *de novo* review" of "[a] district court's legal conclusions in the motion to dismiss context." *United States v. Grenier*, 513 F.3d 632, 635–36 (6th Cir. 2008).

As with any challenge to the applicability of a statute, we begin with the statutory language. *See United States v. Boucha*, 236 F.3d 768, 774 (6th Cir. 2001) ("[T]he language of the statute is the starting point for interpretation . . . .") (quotation marks omitted). Subsection 175(a) provides, in pertinent part:

> Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin, or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both.

---

**2**In the same order, the district court also ruled that 18 U.S.C. § 175(b) was a lesser-included offense of 18 U.S.C. § 175(a), and therefore vacated defendant's conviction under count two as a violation of the Double Jeopardy Clause. The government has not challenged that ruling on appeal.

18 U.S.C. § 175(a). Subsection 175(c), in turn, defines "for use as a weapon" as:

> [T]he development, production, transfer, acquisition, retention, or possession of any biological agent, toxin, or delivery system for other than prophylactic, protective, bona fide research, or other peaceful purposes.

18 U.S.C. § 175(c). Finally, 18 U.S.C. § 178 defines "toxin" as:

> [T]he toxic material or product of plants, animals, microorganisms (including, but not limited to, bacteria, viruses, fungi, rickettsiae or protozoa), or infectious substances, or a recombinant or synthesized molecule, whatever their origin and method of production, and includes--
>
> (A) any poisonous substance or biological product that may be engineered as a result of biotechnology produced by a living organism; or
>
> (B) any poisonous isomer or biological product, homolog, or derivative of such a substance[.]

18 U.S.C. § 178(2). Defendant does not dispute that he produced and possessed ricin, a deadly biological toxin; nor does he dispute that he possessed it for a purpose other than prophylactic, protective, bona fide research, or other peaceful purposes. As a result, he effectively concedes that his conduct falls within the scope of the plain language of § 175(a).

Typically, that would foreclose any argument that the statute does not reach a defendant's conduct. *See Boucha*, 236 F.3d at 774 ("[The statutory language] should also be the ending point if the plain meaning of that language is clear.") (quotation marks omitted). However, defendant argues that the Supreme Court's decision in *Bond* counsels a different result. In that case, the Supreme Court interpreted the statutory analogue to § 175 for chemical weapons, 18 U.S.C. § 229, in light of federalism principles to hold that it did not cover the defendant's "purely local" crime of using chemicals to commit a "common law assault." *Bond*, 134 S. Ct. at 2087, 2090. Drawing on *Bond*, defendant argues that we should interpret similarly the federal prohibition on biological weapons so as not to apply to his "purely local" conduct.

### *Bond v. United States*

In *Bond*, the defendant embarked on a course of revenge after she learned that her husband had fathered a child with her closest friend. *Id*. at 2085. Bond obtained a quantity of 10-chloro-10H-phenoxarsine from her employer (she happened to be a microbiologist) and a vial of potassium dichromate from Amazon.com and applied the chemicals to the friend's car door,

mailbox, and door knob. Although most attempts were unsuccessful at causing harm, on one occasion, the friend suffered a minor chemical burn on her thumb. *Id*. After local prosecutors declined to pursue charges, the U.S. Attorney decided to prosecute, charging her with two counts of possessing and using a chemical weapon in violation of 18 U.S.C. § 229(a). *Id*. Bond moved to dismiss the charges on the basis that § 229 exceeded Congress's enumerated powers and violated the Tenth Amendment. *Id*. at 2086.

In its *Bond* decision, the Supreme Court avoided addressing the constitutional issue, holding instead that, as a matter of statutory interpretation, § 229(a) did not cover the defendant's "unremarkable local offense." *Id*. at 2083. At the outset, the Court rejected the government's argument that the plain language of the statute clearly encompassed her conduct. *Id.* at 2088. The problem with its interpretation, the Court stated, was that "it would 'dramatically intrude upon traditional state criminal jurisdiction,' and we avoid reading statutes to have such reach in the absence of a clear indication that they do." *Id*. (alterations omitted) (quoting *United States v. Bass*, 404 U.S. 336, 350 (1971)). Instead, the Court invoked the interpretative canon that when Congress enacts criminal statutes that have the potential to cover conduct traditionally subject to the States' police power, it should clearly indicate that it intended such an expansive reach. If it does not, in recognition of principles of federalism and respect for state sovereignty, courts should presume that federal criminal statutes do not reach "purely local" crimes. *Id.* at 2089–90.

The Court observed that Congress was unclear whether it intended § 229 to cover "purely local" crimes. *Id.* at 2090. "[T]he ambiguity," as the Court put it, of § 229 "derive[d] from the improbably broad reach" of the statutory term being defined, the deeply serious consequences of such a boundless reading, and the lack of any apparent need for such a reading in light of the context in which the statute was enacted. *Id*. Having established § 229's ambiguity, and guided by principles of federalism, the Court reasoned that "[t]he natural meaning of 'chemical weapon'"—one that "an educated user of English" would understand—"takes account of both the particular chemicals that the defendant used and the circumstances in which she used them." *Id.*

In Bond's case, the Supreme Court held that the chemicals she used, and the manner in which she used them, were not the sort that an ordinary person would associate with instruments

of chemical warfare. *Id.* First, the chemicals Bond used "b[ore] little resemblance to the deadly toxins that are of particular danger to the objectives of the [Chemical Weapons] Convention." *Id*. at 2090 (quotation marks omitted). Second, the defendant did not use the chemicals as a "weapon" as that term is ordinarily understood, i.e., as "an instrument of attack or defense in combat, as a gun, missile, or sword[.]" *Id*. (alteration omitted) (quoting American Heritage Dictionary 2022 (3d ed. 1992)). Using something as a "weapon," the Court said, connotes "combat," and no speaker in natural parlance would say Bond's conduct was "combat." *Id*. (citing Webster's Third New International Dictionary 2589 (2002) and American Heritage Dictionary 2022 (3d ed. 1992)).

Notably, the *Bond* Court was careful to define the contours of its holding. The Court opined that the chemicals Bond used could have been a "chemical weapon" if used differently, for example, to poison the city's water supply. *Id*. at 2091. It also recognized that the federal government has a substantial interest in enforcing criminal laws against assassination, terrorism, and acts with the potential to cause mass suffering. *Id*. at 2092. Nothing in *Bond* was intended to "disrupt the Government's authority to prosecute such offenses." *Id*. The Court cited the handful of cases prosecuted under § 229, noting that most "involved either terrorist plots or the possession of extremely dangerous substances with the potential to cause severe harm to many people." *Id*. (citing *United States v. Ghane*, 673 F.3d 771 (8th Cir. 2012) (defendant possessed enough potassium cyanide to kill 450 people); *United States v. Crocker*, 260 F. App'x 794 (6th Cir. 2008) (defendant attempted to acquire VX nerve gas and chlorine gas as part of a plot to attack a federal courthouse); *United States v. Krar*, 134 F. App'x 662 (5th Cir. 2005) (per curiam) (defendant possessed sodium cyanide); *United States v. Fries*, No. CR-11-1751-TUC-CKJ, 2012 WL 689157 (D. Ariz. Feb. 28, 2012) (defendant set off a homemade chlorine bomb in the victim's driveway, requiring evacuation of a residential neighborhood).

## Application of *Bond*

We agree with defendant Levenderis that the broad parallels between this case and *Bond* are clear: both § 229 and § 175 originate in the Geneva Protocol of 1925 and both are treaty-implementing statutes. *Compare* Chemical Weapons Convention Implementation Act, Pub. L. No. 105-277 div I, 112 Stat. 2681, 2681–856 (1998), *with* Biological Weapons Anti-Terrorism

Act of 1989, Pub. L. No. 101-298, 104 Stat. 201 (1990). In addition, both § 229 and § 175 use expansive statutory language that, although not identically worded, outlaws any possession or use of a chemical or biological agent (which terms are expansively defined) that are not for a specific "peaceful purpose." *Compare* 18 U.S.C. § 229F *with* 18 U.S.C. § 175(c). As a result, given the similarities between § 175 and § 229, we follow the Supreme Court's instruction and interpret § 175 in light of federalism principles, just as it did with § 229 in *Bond*.

However, whether *Bond* requires reversal of defendant's conviction is a separate question. To answer that, we must closely examine the Court's statutory analysis after it decided to apply the federalism canon of construction. *See Bond*, 134 S. Ct. at 2090–94.[3] There are two basic components to *Bond*'s statutory analysis: (1) the type of chemicals used and (2) the manner or circumstances in which the defendant used them. *See id.* at 2090 ("The natural meaning of 'chemical weapon' takes account of both the particular chemicals that the defendant used and the circumstances in which she used them."). Applying that framework here, the question is whether the type and intended use of the biological toxin in this case brings defendant's conduct within the common and ordinary meaning of "biological weapon." We conclude that it does.

First, the type of substance defendant used is significantly more dangerous than the chemicals used in *Bond*. "Ricin . . . is extremely deadly. There is no known antidote for ricin poisoning." *United States v. Baker*, 98 F.3d 330, 333 (8th Cir. 1996). Ricin is designated as a "select toxin" by the Secretary of Health and Human Services, which means it has "the potential to pose a severe threat to public health and safety." *See* 42 C.F.R. § 73.3. More importantly, and in direct contrast to the chemicals in *Bond*, ricin is listed in Schedule 1 of the Annex on Chemicals in the Chemical Weapons Convention. *See* Convention on the Prohibition of the

---

[3]We disagree with defendant that our recent decision in *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014), provides much guidance in this case. *Toviave* involved a prosecution under the federal forced labor statute, 18 U.S.C. § 1589, in which the defendant physically abused children under his care if they did not perform household chores. 761 F.3d at 624. In holding that this conduct—traditionally proscribable under state child abuse laws—did not constitute "forced labor" under § 1589, this court cited *Bond* for the proposition that "we should be cautious in inferring Congressional intent to criminalize activity traditionally regulated by the states." *Id.* at 627. *Toviave*'s reliance on *Bond* was limited to its discussion of *whether* to apply the federalism canon of construction. *See id.* at 628. As noted above, we agree that we should apply *Bond*'s federalism canon; but it is a separate question entirely *how* to apply it to a particular statute in a particular case. In this respect, *Bond*'s reasoning involving a closely related chemical weapons statute is more instructive than *Toviave*'s analysis of the federal forced labor statute.

Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, Annex on Chemicals, Sch. 1, *opened for signature* Jan. 13, 1993, S. Treaty Doc. No. 103-21, 1974 U.N.T.S. 317, 358 (entered into force April 29, 1997). This was the document that the Supreme Court referenced in observing that the chemicals at issue in *Bond* "b[ore] little resemblance to the deadly toxins that are 'of particular danger to the objectives of the Convention.'" *Bond*, 134 S. Ct. at 2090 (quoting Kenyon, Why We Need a Chemical Weapons Convention and an OPCW, in The Creation of the Organisation for the Prohibition of Chemical Weapons 1, 17 (I. Kenyon & D. Feakes eds. 2007) and explaining that the authors "describ[e] the Convention's Annex on Chemicals, a nonexhaustive list of covered substances that are subject to special regulation"). Thus, by *Bond*'s benchmark, ricin is a particularly dangerous substance in the eyes of the world community. *See* Chemical Weapons Convention, Annex on Chemicals, S. Treaty Doc. No. 103-21, 1974 U.N.T.S. 317, 356 (indicating that Schedule 1 substances are those that "pose[] . . . a high risk to the object and purpose of this Convention").

The manner in which defendant intended to use the ricin is the more difficult question. In concluding that the defendant's use of chemicals did not fall within the scope of § 229, the *Bond* Court juxtaposed Bond's "common law assault" with cases involving "terrorist plots or the possession of extremely dangerous substances with the potential to cause severe harm to many people." *Id*. at 2087, 2092. Thus, *Bond* essentially identified two poles, leaving lower courts to determine where a particular defendant's conduct falls along the spectrum of "common law assault" to "terrorist plots [and] the possession of extremely dangerous substances with the potential for severe mass harm."

In this case, the government presented evidence that, among other things, Levenderis intended to use the ricin as part of an elaborate suicide plot in which he would light his house on fire and hang bottles of ricin from the entrances to his home to prevent firefighters from entering to put out the fire. In identifying where along the *Bond* spectrum this conduct falls, we conclude it is more akin to facts of the cases the *Bond* Court indicated were actionable than it is to the facts in the *Bond* opinion itself. One of the cases cited, *Ghane*, 673 F.3d 771, is particularly analogous.

In *Ghane*, the defendant was hospitalized for suicidal ideations and told physicians that if he were to commit suicide he would use cyanide, which he had in his apartment. 673 F.3d at 775. He also stated that "he had thoughts of harming others affiliated with the Corps of Engineers and that he had access to chemicals." *Id*. at 776. However, he did not identify specific individuals. *Id*. Law enforcement searched his apartment and found 177 grams of cyanide, enough to kill 450 people. *Id*. at 776 n.3. The defendant was charged under § 229(a), and the Eighth Circuit affirmed his convictions on appeal. As noted above, the Supreme Court cited Ghane's prosecution as permissible under its holding in *Bond*. *Bond*, 134 S. Ct. at 2092.

Like the defendant in *Ghane*, Levenderis intended to use the prohibited substance as part of a suicide plot and against an unknown number of government workers (firefighters and first-responders). Also like *Ghane*, the amount and toxicity of the substance was enough to kill hundreds of people. Although there was no evidence that Ghane had plans to use it against that many people, the potential for that magnitude of harm was present. In this case, defendant possessed enough ricin to be lethal to hundreds of people exposed to the substance through inhalation. Defendant counters that the ricin he produced was too crude to be lethal when inhaled. Insofar as defendant claims that he did not possess enough ricin to be used as a weapon capable of causing mass harm, the evidence does not support his claim. The government's expert witness, Dr. Robert Bull, testified that the amount of ricin was enough to kill at least 257 people if inhaled. Defendant argues that, on cross-examination, Dr. Bull conceded that "we don't know if this substance would be lethal if inhaled . . . ." However, that line of questioning related to the size of the ricin particles and whether they could travel to the deepest part of the lungs; Dr. Bull later reaffirmed that, regardless of particular size, ricin kills any cells it comes into contact with. It is the natural and probable consequence of hanging ricin in the entrances of a burning house that first-responders and firefighters—whose job it is to enter burning structures to save lives and nearby properties—would be exposed to the lethal toxin. Moreover, given the amount and toxicity of the substance, defendant's intended use of ricin had the potential to cause harm to anyone in the vicinity, including local residents.

In sum, defendant produced a substance that is lethal in very small amounts and that has no known antidote. He possessed enough ricin to kill over 250 people. The lethality of ricin,

combined with the fact that he intended to use it in a way that could have exposed an unknown number of firefighters, first-responders, and residents to the substance, demonstrates that defendant's conduct had the potential to cause mass harm.  It was this *potential* for harm to many people that distinguished Bond's conduct from cases like *Ghane*, which the *Bond* Court recognized were still subject to prosecution under the statute.  *Id*. at 2092.  And it is this same potential for mass harm that distinguishes defendant Levenderis' conduct from the "purely local" crime at issue in *Bond*.  After applying *Bond*'s framework, we hold that the confluence of both the inherent danger of ricin and the harmful, albeit bizarre, manner in which he intended to use it brings Levenderis' conduct within the ordinary and common sense meaning of "biological weapon."  Therefore, *Bond* does not require reversal of defendant's conviction under § 175(a).

B.

In his second claim on appeal, Levenderis asserts that the district court erred in denying his motion to suppress the statements he gave to the FBI agents.  Defendant argues that, contrary to the district court's conclusion, he *was* "in custody" during the January 24 and 27, 2011, interviews for purposes of *Miranda*.  "When reviewing the district court's decision regarding a motion to suppress, we review its factual findings for clear error and its legal conclusions de novo."  *United States v. Evans*, 581 F.3d 333, 340 (6th Cir. 2009).  The issue whether a defendant was "in custody" is a mixed question of law and fact that is reviewed de novo.  *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998).

Law enforcement officials are required to advise a person of their "*Miranda* rights" before engaging in "custodial interrogation."  *See Miranda*, 384 U.S. 436.  This requirement applies "only where there has been such a restriction on a person's freedom as to render him 'in custody.'"  *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  In determining whether a person is "in custody" for purposes of *Miranda*, courts look to "the objective circumstances of the interrogation . . . to determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action[.]"  *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (internal quotation marks and citation omitted).  This inquiry involves several factors, including "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement;

and (4) whether the individual was told that he or she did not need to answer the questions." *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010). Consideration of these factors and the totality of the circumstances lead us to conclude that defendant was not in custody for purposes of *Miranda*.

First, the location of the interview weighs against a finding of custody because, although it was not his permanent home, the nursing home had been defendant's residence for several months by the time the FBI interviewed him. Thus, the interview did not take place in an unfamiliar setting like the stationhouse or FBI field office. *See Beckwith v. United States*, 425 U.S. 341, 346 n.7 (1976) (observing that a central concern for the *Miranda* Court was "isolating the suspect in unfamiliar surroundings 'for no purpose other than to subjugate the individual to the will of his examiner'") (quoting *Miranda*, 384 U.S. at 457).

Second, the length of questioning during the first interview was relatively brief, approximately thirty minutes, and the second interview lasted only a few minutes. Defendant argues that, although brief in duration, the purpose of the FBI's questioning was because he was a suspect. However, the Supreme Court has "explicitly recognized that *Miranda* warnings are not required 'simply . . . because the questioned person is one whom the police suspect.'" *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Mathiason*, 429 U.S. at 495).

Third, there were no restraints on defendant's freedom of movement. Defendant stresses the fact that the room was small and the agents sat closely around his bed while they questioned him. However, there is also no evidence agents prevented him from getting up from his bed. The FBI agents testified that the questioning was not forceful, and they did not brandish their weapons as a show of force. *See United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (noting that the interviewing officer "at no time made any show of force or brandished a firearm or handcuffs, or any other equipment ordinarily associated with formal arrest or custody"). Moreover, although defendant claims in his brief on appeal that he was "physically restricted" in the nursing home, there is no evidence that defendant was incapacitated. The agents found defendant walking just outside his room, introduced themselves as FBI agents, and asked if they could speak with defendant. He said "yes" and walked under his own power into his room where agents interviewed him. Defendant was also able to place and receive phone calls during the

interviews, something a reasonable person in police custody would not feel free to do. *See United States v. LeBrun*, 363 F.3d 715, 722 (8th Cir. 2004) (en banc) ("While the mere possession of a cellular phone without more will not transform a custodial interrogation into a noncustodial one, it is relevant to the question of whether the interview was coercive and whether a reasonable person in the same circumstances would feel restrained."); *United States v. Unser*, 165 F.3d 755, 766 (10th Cir. 1999) (noting that use of a cell phone during an interview is a factor supporting a finding of no custody).

Fourth and finally, weighing in defendant's favor is the fact that agents did not tell him he was free to stop the interview or ask them to leave. However, this is only one of several factors to consider, and it is not dispositive. *See Panak*, 552 F.3d at 467 ("[T]he existence of such advice is one factor among many and we have never held that it is a necessary condition (as opposed to a frequently sufficient condition) before officers may question an individual in a non-custodial setting.") (internal citation omitted). In light of the surrounding circumstances, including the familiar setting, defendant's ability to make and receive calls, the fact that agents never told defendant he was *not* free to leave, and the absence of any other indicia of coerciveness, this factor alone does not transform an otherwise non-custodial setting into a custodial one.

Because the totality of the circumstances demonstrates that a reasonable person would understand he or she could have asked the agents to leave at any time, and because defendant was not "deprived of his freedom of action in any significant way[,]" *Mathiason*, 429 U.S. at 494, he was not in custody for *Miranda* purposes. We therefore affirm the district court's denial of defendant's motion to suppress.

## C.

Finally, defendant argues that his trial counsel provided ineffective assistance by withdrawing his *Daubert* challenge to the government's expert witness and by failing to challenge the reliability of the fourth test used to determine that the substance he possessed was ricin. "Ineffective assistance of counsel claims are mixed questions of law and fact, which appellate courts review de novo." *United States v. Doyle*, 631 F.3d 815, 817 (6th Cir. 2011).

"As a general rule, a defendant may not raise ineffective assistance of counsel claims for the first time on direct appeal, since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations." *United States v. Wunder*, 919 F.2d 34, 37 (6th Cir. 1990). We may grant an exception to this general rule where the parties have adequately developed the record so as to enable us to reach the merits of the claim. *Id*.

This is no occasion to deviate from our general rule. First, the record is silent regarding trial counsel's decision not to challenge the fourth test conducted by the government. Second, with respect to counsel's decision to partially withdraw his initial *Daubert* challenge, the record indicates that on the second day of the *Daubert* hearing counsel explained to the court that his challenge to the tests went to weight, rather than admissibility. The record also reveals that defense counsel resurrected his *Daubert* challenge to the first two tests during trial. However, other than counsel's brief comment on the record about his objection going to weight, not admissibility, the record is undeveloped with respect to counsel's initial decision to withdraw his *Daubert* challenge to the first two tests. We are not persuaded that this small window into defense counsel's thought process is sufficient to resolve this issue, especially in light of his subsequent decision to resurrect the *Daubert* challenge. *See United States v. Williams*, 753 F.3d 626, 637 (6th Cir. 2014) ("We . . . have 'no way of knowing whether [this] seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse.'") (quoting *Massaro v. United States*, 538 U.S. 500, 505 (2003)). Because appellate courts are generally ill-equipped to address ineffective assistance of counsel claims on an undeveloped record on direct appeal, and defendant provides no reason why we should deviate from our general practice, we decline to address this claim. *See United States v. Franco*, 484 F.3d 347, 355 (6th Cir. 2007) (relying on "the general rule against ineffective assistance of counsel claims on direct appeal" to "abstain from ruling on th[e] issue").

III.

For the foregoing reasons, we affirm defendant's convictions.